NO. 13-2537

In The
United States Court Of Appeals
For The Fourth Circuit

**JOHN DOE AND JANE DOE,**
**individually and as next friends to J.D., a minor child,**

**Plaintiffs - Appellants,**

**v.**

**THE BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY**
**AND KATHLEEN SCHWAB,**

**Defendants - Appellees.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
———————————————

**BRIEF OF APPELLANTS**
———————————————

Sharon Krevor-Weisbaum
Andrew D. Freeman
Laura Ginsberg Abelson
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street
Suite 1700
Baltimore, Maryland 21202
Telephone: (410) 962-1030
Facsimile: (410) 385-0869
adf@browngold.com
skw@browngold.com
LAbelson@browngold.com

*Attorneys for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-2537        Caption: John Doe, et al. v. Board of Education of Prince George's County

Pursuant to FRAP 26.1 and Local Rule 26.1,

John and Jane Doe
(name of party/amicus)


who is        appellant        , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                             ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                 ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: Laura G. Abelson                    Date: _____ 01/6/14 _____

Counsel for: Appellants

## CERTIFICATE OF SERVICE
*************************

I certify that on _____ January 6, 2014 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____ s/ _____                                    _____ January 6, 2013 _____
      (signature)                                            (date)

# TABLE OF CONTENTS

CORPORATE DISCLOSURE FORM ................................................................... ii

TABLE OF AUTHORITIES ........................................................................... vii

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES.......................................................................2

STATEMENT OF THE CASE...........................................................................3

STATEMENT OF FACTS ................................................................................3

    I.    J.D. reported many instances of sexual harassment to school officials. ...................................................................4

    II.    Staff and administrators at RGMS demonstrated a culture of indifference to sexual harassment complaints by failing to take meaningful action to investigate J.D.'s harassment complaints or to protect J.D. from M.O. ...........................8

    III.    The RGMS teacher communications logs demonstrate the school's lax attitude toward sexual harassment complaints. ......................................................................21

    IV.    Because of the sexual harassment J.D. experienced at M.O.'s hands while he was a student at RGMS, J.D. suffered both immediate harm that disrupted his ability to access an education at RGMS and lasting psychological harm that continues to affect his functioning today.............................23

SUMMARY OF THE ARGUMENT .................................................................25

STANDARD OF REVIEW .............................................................................27

ARGUMENT ...................................................................................................27

    I.    The Board of Education and Ms. Schwab negligently failed to protect J.D. from sexual harassment. ..............................27

A.  The Board of Education and Ms. Schwab breached
their special duty under *Lunsford v. Board of
Education* to protect J.D. from M.O. by failing to
prevent M.O.'s escalating harassment of J.D. ..........................28

B.  A reasonable jury could conclude that the Board of
Education's and Ms. Schwab's failure to properly
investigate and intervene to stop a known pattern
of sexual harassment was both the cause-in-fact
and the proximate cause of J.D.'s injuries. ..............................33

C.  A reasonable jury could conclude that J.D. was not
contributorily negligent and did not assume the
risk of sexual abuse, by continuing to use the
school bathroom after he had been sexually
harassed there. ..........................................................................38

II.  A reasonable jury could conclude that the Board of Education
and Ms. Schwab discriminated against J.D. on the basis of sex
in violation of Title IX. ......................................................................41

A.  A reasonable jury could conclude that the
harassment J.D. suffered was so severe and
pervasive that he was denied equal access to the
educational opportunities available at RGMS
because of his psychological harm, his withdrawal
from school, and his fear of using the school
bathroom. ..................................................................................42

i.  The harassment J.D. suffered was severe and
pervasive within the meaning of Title IX......................42
ii.  The harassment J.D. suffered effectively
denied him equal access to educational
opportunities. ................................................................44

B.  A reasonable jury could conclude that the Board of
Education and Ms. Schwab acted with deliberate
indifference to J.D.'s complaints by failing to
properly investigate his claims and those of his

parents, and therefore failing to take actions that
were reasonably calculated to stop the harassment. .................47

CONCLUSION .................................................................................55

CERTIFICATE OF COMPLIANCE.......................................................57

CERTIFICATE OF SERVICE ...............................................................58

# TABLE OF AUTHORITIES

**Cases**

*B.N. v. K.K.*,
312 Md. 135 (1988) ......................................................28

*Baltimore Gas and Elec. Co. v. Flippo*,
348 Md. 680 (1998) ......................................................39

*Baltimore v. Whittington*,
78 Md. 231 (1893) ......................................................49

*Boyer v. State*,
323 Md. 558 (1991) ......................................................30

*Brodeur v. Claremont Sch. Dist.*,
626 F. Supp. 2d 195 (D.N.H. 2009) ............................................51

*Brown v. Rogers*,
19 Md. App. 562 (1974) ......................................................38

*Bruning ex rel. Bruning v. Carroll Cnty. Sch. Dist.*,
486 F. Supp. 2d 892 (N.D. Iowa 2007) ................................ 43, 44, 45, 50, 52

*Campbell v. Montgomery Cnty. Bd. of Educ.*,
73 Md. App. 54 (1987) ......................................................38

*Chancellor v. Pottsgrove Sch. Dist.*,
501 F. Supp. 2d 695 (E.D. Pa. 2007) ......................................................52

*Davis v. Monroe Cnty. Bd. of Ed.*,
526 U.S. 629 (1999) .................................................... 42, 43

*DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*,
576 F.3d 820 (8th Cir. 2009) ......................................................10

*Doe ex rel. Doe v. Derby Bd. of Educ.*,
451 F. Supp. 2d 438 (D. Conn. 2006) .................................... 45, 46

*Eisel v. Bd. of Educ. of Montgomery Cnty.*,
324 Md. 376 (1991) .................................................... 28, 29

*Hammond v. Robins*,
60 Md. App. 430 (1984) ................................................................36

*Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*,
335 Md. 135 (1994) ......................................................................36

*Hawkins v. Sarasota County Sch. Bd.*,
322 F.3d 1279 (11th Cir. 2003) ...................................................46

*Henley v. Prince George's Cnty.*,
305 Md. 320 (1986) ......................................................................36

*Henson v. Liggett Group, Inc.*,
61 F.3d 270 (4th Cir. 1995) .........................................................27

*Hill v. Wilson*,
134 Md. App. 472 (2000) .............................................................38

*Int'l Brotherhood of Teamsters v. Willis Corroon Corp. Of Maryland*,
369 Md. 724 (2002) ......................................................................38

*Jackson v. Kimel*,
992 F.2d 1318 (4th Cir.1993) ......................................................27

*Jacques v. First Nat'l Bank*,
307 Md. 527 (1986) ......................................................................27

*Jennings v. Univ. of N.C.*,
482 F.3d 686 (4th Cir. 2007) .......................................................41

*Liscombe v. Potomac Edison Co.*,
303 Md. 619 (1985) ......................................................................40

*Lunsford v. Bd. of Educ.*,
280 Md. 665 (1977) ........................................................ 27, 28, 29, 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).....................................................................30

*Mayor & City Council of Balt. v. Hart*,
395 Md. 394 (2006) ......................................................................31

*Maytag Corp. v. Electrolux Home Products, Inc.*,
    448 F. Supp. 2d 1034 (N.D. Iowa 2006) ......................................................10

*Michelle M. v. Dunsmuir Joint Union Sch. Dist.*,
    204CV2411MCEPAN, 2006 WL 2927485 (E.D. Cal. Oct. 12, 2006) .........52

*Montgomery v. Indep. Sch. Dist. No. 709*,
    109 F. Supp. 2d 1081 (D. Minn. 2000) ........................................................45

*Moodie v. Santoni*,
    292 Md. 582 (1982) ......................................................................................38

*Okoli v. City of Balt.*,
    648 F.3d 216 (2011) ......................................................................................49

*Peterson v. Underwood*,
    258 Md. 9 (1970) ..........................................................................................37

*Pittway Corp. v. Collins*,
    409 Md. 218 (2009) .................................................................................. 33, 35

*Reid v. Wash. Overhead Door, Inc.*,
    122 F.Supp.2d 590 (D. Md. 2000)................................................................40

*Seiwert v. Spencer-Owen Cmty. Sch. Corp.*,
    497 F. Supp. 2d 942 (S.D. Ind. 2007).........................................................45

*Snelling v. Fall Mountain Reg'l Sch. Dist.*,
    CIV. 99-448-JD, 2001 WL 276975 (D.N.H. Mar. 21, 2001).......................44

*Stone v. Chicago Title Ins. Co. of Maryland*,
    330 Md. 329 (1993) ......................................................................................36

*Theno v. Tonganoxie Unified Sch. Dist No. 464*,
    377 F. Supp. 2d 952 (D. Kan. 2005) ............................................... 42, 44, 45

*Troxel v. Iguana Cantina, LLC*,
    201 Md. App. 476 (2011) ..............................................................................28

*Vance v. Spencer Cnty. Pub. Sch. Dist.*,
    231 F.3d 253 (6th Cir. 2000) .................................................... 44, 45, 48, 50

**Statutes**

20 U.S.C. § 1681 .................................................................1

28 U.S.C. § 1291 .................................................................1

28 U.S.C. § 1331 .................................................................1

**Rules**

Fed.R.Civ.P. 56 ............................................................ 27, 39

## <u>JURISDICTIONAL STATEMENT</u>

This appeal presents issues of federal law under 20 U.S.C. § 1681.  The district court had jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.  The district court entered a final Order granting Defendants' motion for summary judgment on November 18, 2013.  Plaintiffs filed a timely notice of appeal on December 17, 2013.

## <u>STATEMENT OF THE ISSUES</u>

1.   Whether the district court erred in holding as a matter of law that the Board of Education and Ms. Schwab did not negligently fail to protect J.D. from peer sexual harassment?

   a.   Whether the district court erred in holding as a matter of law that Appellees did not breach their duty to J.D. under *Lunsford v. Board of Education*?

   b.   Whether the district court erred in holding as a matter of law that Appellees' failure to properly investigate and intervene to stop a known pattern of sexual harassment was neither the cause-in-fact, nor a proximate cause of J.D.'s injuries?

   c.   Whether the district court erred in holding, as a matter of law that J.D., a nine-year-old boy, was contributorily negligent and assumed the risk of sexual abuse by continuing to use the school bathroom after he had been sexually harassed there?

2.   Whether the district court erred in holding as a matter of law that the Board of Education and Ms. Schwab did not discriminate against J.D. on the basis of sex in violation of Title IX?

   a.   Whether the harassment J.D. suffered was so severe and pervasive that he was denied equal access to the educational opportunities available at Robert Goddard Montessori School because of his psychological harm, his withdrawal from school, and his fear of using the school bathroom?

   b.   Whether the district court erred in holding that the Board of Education and Ms. Schwab did not act with deliberate indifference to J.D.'s complaints by failing to properly investigate his claims and those of his parents, and therefore failing to take actions that were reasonably calculated to stop the harassment?

## STATEMENT OF THE CASE

Plaintiffs John and Jane Doe brought this suit to seek redress for the Board of Education of Prince George's County's and Kathleen Schwab's failure to protect their son, J.D., from ongoing sexual harassment and bullying by M.O., a classmate of J.D.'s, that ultimately culminated in M.O.'s repeated rape of J.D. in the school bathroom. The Does brought a state law claim for negligence and a claim for sex discrimination under Title IX of the Educational Amendments Act of 1972.

The district court granted Appellees' motion for summary judgment, and the Does now appeal from that decision.

## STATEMENT OF FACTS

During the 2008-09 and 2009-10 school years, J.D. was a fourth, and then fifth grader at Robert Goddard Montessori School ("RGMS"), a public Montessori school in Prince George's County, Maryland, where he was sexually harassed, otherwise bullied, and ultimately repeatedly raped by M.O. Between October 2008 and June 2010, J.D. and his parents reported to school officials on more than ten occasions that M.O. was harassing J.D., both physically and verbally. J.D. and his parents made these reports to J.D.'s classroom teacher, Lisa Jellison; the principal, Suzanne Johnson;[1] the assistant principal (and later the principal) Kathleen

---

[1] Ms. Johnson passed away in the spring of the 2008-09 school year.

Schwab; the school security officer, David Pfeil; and the area superintendent's office.  JA 502-04, 510-14, 525-26, 542-44, 554, 597-98, 620-22, 692-93.

School officials were the only people positioned to stop the harassment from escalating.  They had power over M.O. and knowledge of the harassment.  Despite knowing that there was an ongoing, escalating pattern of sexual harassment and other bullying by M.O. toward J.D., school officials conducted no meaningful investigation of J.D.'s and his parents' complaints and took no reasonable action to protect J.D. from the increasingly serious harassment.

**I.     J.D. reported many instances of sexual harassment to school officials.**

The harassment started with name-calling and verbal harassment during J.D.'s fourth grade year (2008-09), when M.O. and another student regularly called him "gay," and used other sex-based name calling, such as "pussy" and "bitch." JA 516-18, 545-46, 551-53, 600.  Ms. Schwab, who was then the vice principal, recalled that J.D. approached her in October of his fourth grade year to report, as she described it, that M.O. "had said something to him in the bathroom that was of a sexual nature." JA 645.  J.D. also told Ms. Jellison (JA 516-18) and his parents (JA 545-46) about the sexual name-calling, after which Mr. Doe reported J.D.'s complaints to Ms. Schwab.  JA 545-46.

In December 2008, M.O. and J.D. were in the classroom library, an area with shelves and pillows on the floor where students were permitted to sit and read.

M.O. unzipped his pants and exposed his genitals to J.D. JA 521-22. J.D. reported this incident to both Ms. Schwab and Ms. Jellison. JA 368, 370-71, 598-99, 631-33. Because no one at RGMS would respond to her complaint about this incident, Ms. Doe called the areaSuperintendent's office. JA 511-14. After that call, Principal Johnson contacted her, and Mr. and Ms. Doe met face-to-face with Principal Johnson and Ms. Schwab to express their concerns about M.O.'s harassment of J.D.

In March 2009, the unwanted contact by M.O. towards J.D. escalated further. M.O. grabbed J.D. and made humping gestures toward him during a class dance activity. JA 589-90. Ms. Jellison's contemporaneous records reflect that Mr. Doe reported the incident to Ms. Jellison and expressed concern that M.O.'s sexually harassing behavior was an ongoing problem. JA 315 (M.O. "keeps making sexual remarks"). At least three other students witnessed the incident and told Ms. Jellison that M.O. had also made inappropriate sexual remarks to them. JA 315, 577-79. Ms. Jellison's log reflects that she referred both the other students and Mr. Doe to Ms. Schwab.[2] *Id.*

M.O.'s harassment of J.D. continued into J.D.'s fifth-grade year, when both M.O. and J.D. were placed in the same class, notwithstanding the fact that Ms. Jellison thought they should be separated:

---

[2] Ms. Schwab now denies that she was ever informed of the incident. JA 651-54.

. . . In fact, now is a good time for me to bring something up. I'm
very surprised that [J.D.] was put in my classroom in fifth grade
because of problems that were happening in fourth grade.
Q. Okay. And why was he put in your classroom in fifth grade?
A. I don't know. That's beyond me.

JA 586. In the Fall of 2009, J.D. reported to Ms. Schwab, who was now the

principal, that M.O. continued to make comments that made J.D. "uncomfortable."

JA 676-78.

In January 2010, J.D. reported that M.O. had tried to climb into his

bathroom stall "half naked" and that J.D. had to climb under the stall to run away

from him. JA 386. J.D. reported this incident to his parents on a Friday afternoon,

and Mr. Doe went to the school the following Monday to report the incident to

school officials. *See* Ex. A, Aff. of John Doe, ¶ 3.[3]

Mr. and Mrs. Doe were at the school with increasing frequency in J.D.'s

fifth-grade year because of their concerns about how M.O.'s harassment was

affecting J.D. JA 592-93, 608. Ms. Jellison remembers that there were "so many"

incidents that she had trouble remembering some of the specifics. JA 593. Ms.

Schwab's records also include notes that J.D. reported that "[M.O.] accosted [J.D.]

in hallway" in February 2009, (JA 371), and that J.D. reported to Ms. Schwab that

M.O. harassed him by the water fountain. JA 368.

---

[3] As explained further in the Does' Motion for Leave to File Supplemental
Material, the district court decided several issues *sua sponte*, without permitting
the Does the opportunity to respond as required under Fed. R. Civ. P. 56(f). the
exhibits to this brief contain evidence relevant to those rulings.

In all, Appellees have admitted that J.D. sought help and intervention for at least ten specific incidents of sexual harassment or bullying.  These include:

1)  Sex-based name calling that began in October 2008, J.D.'s second month at RGMS, in which M.O. began calling J.D. "gay" "pussy" and "bitch" and continued to do so on multiple occasions.  JA 516-18, 545-46, 600.

2)  The incident in October 2008 as to which Ms. Schwab testified that J.D. complained that M.O. "had said something to him in the bathroom that was of a sexual nature."  JA 645.

3)  The incident in the winter of 2008-09 when M.O. unzipped his pants and exposed his genitals to J.D., which Ms. Schwab described as "serious and disturbing."  JA 521-22, 631-33, 662-64.

4)  The March 2009 incident in which M.O. grabbed J.D. and humped him in class.  JA 589-90, 743.

5)  Mr. Doe's March 2009 complaint that "M.O. keeps making sexual remarks and gestures" toward J.D.  JA 375.

6)  The incident in January 2010 in which M.O. was in the bathroom half-naked with his pants down and tried to climb into J.D.'s bathroom stall.  JA 692-93.

7)  The Fall 2009 incident about which Ms. Schwab acknowledged that J.D reported to her that M.O. had said something to him that made him "uncomfortable."  JA 676-78.

8)  The incident in Ms. Schwab's log in which J.D. reported that M.O. "made a harassing remark" to him at the water fountain in November 2009.  JA 324.

9)  The incident in Ms. Schwab's contemporaneous log in which she wrote that "[M.O.] accosted [J.D.] in the hallway" in February 2009. JA 371.

10)   Mr. and Ms. Doe's increasingly frequent complaints about the near-constant bullying by M.O. that J.D. reported to them.  JA 608.

Appellees' failure to respond to the many complaints from J.D. and his parents about M.O.'s harassing behavior allowed that behavior to escalate to the point where J.D. was forced to participate in sexual acts with M.O. in the school bathroom and the school library.  J.D. testified at his deposition that on several different occasions in the school bathroom M.O. tried to force J.D. to perform oral sex on him (JA 530), M.O. tried to kiss J.D. and perform oral sex on him (JA 531-38), and M.O. attempted to have anal sex with J.D.  JA 537-38.  When the police interviewed him in the Summer of 2010, M.O. confirmed that these actions had occurred.  JA 459-60.  J.D. has consistently maintained that, like the name calling and other pervasive and persistent harassment he experienced, this contact was unwelcome and unwanted.

## II.   Staff and administrators at RGMS demonstrated a culture of indifference to sexual harassment complaints by failing to take meaningful action to investigate J.D.'s harassment complaints or to protect J.D. from M.O.

As discussed above, beginning in Fall 2008 school officials knew that M.O. was sexually harassing J.D.  They were the only people in a position to determine the full extent of the harassment and to take steps to stop it.  Instead, they took a few half-steps that were not designed to determine what was actually happening between the children or to prevent contact between them.  Moreover, they knew

8

that their efforts were ineffective, yet did not take additional steps to protect J.D. from M.O.

At no point during the two school years in which J.D. and his parents complained about M.O.'s harassment did school officials conduct a meaningful investigation into the allegations. Experts for both parties agree that an effective investigation of an allegation of sexual harassment must contain a number of steps calculated to assess the credibility of witnesses and determine the full extent of the behavior that occurred.

Susan Strauss, a nationally recognized expert in the training of school officials to handle sexual harassment. The report listed thirteen steps of a proper sexual harassment investigation:

1. Receive the complaint and document the interview [with the complainant].

2. Interview the witnesses and document the interview[s].

3. Interview the accused and document the interview. Numbers 2 and 3 may be interchanged depending on the circumstances and the investigator's preference.

4. The investigators must know the appropriate interview questions to ask the victim, the accused, and the witnesses. The interviewer must also be knowledgeable in how to interview children.

5. Review evidence such as student records, absenteeism, and discipline.

6. Review the District's harassment and other pertinent policies to ensure compliance.

7.    Review relevant state and federal laws, OCR's *Guidance,* and OCR's two *Dear Colleague Letters* to ensure compliance and appropriate follow through.

8.    Visit the sites of the incidents, when appropriate, to appraise the environment and gain a clearer vision of where and how the incidents occurred.

9.    Synthesize and analyze all information.

10.    Corroborate evidence gathered during the investigation.

11.    Reach a conclusion and make a determination as to whether sexual misconduct occurred, whether it is a violation of the District's policies, and whether the misconduct rose to the level of sexual harassment, weighing the evidence with the requirements of Title IX and OCR's regulations.

12.    Provide the results of the investigation to the target, the accused, and those who "need to know," such as the principal, assistant principal, and, depending on the severity, the superintendent and school board.

13.    Write a formal report and maintain the report in the Title IX coordinator's office for a minimum of one year. Include the harasser's discipline in his or her student file.  Dr. Strauss confirmed the opinions in her report in her sworn deposition.[4]  *See* Ex. B, Strauss Dep. 56-57

JA 426-27.

---

[4] Courts are permitted to rely on proffered expert testimony where the experts have confirmed their opinions under oath at deposition.  *See, e.g.*, *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006); *see also DG&G, Inc. v. FlexSol Packaging Corp.*, 576 F.3d 820, 826 (8th Cir. 2009). The district court erroneously found that Dr. Strauss's opinions were not supported by the record even though many of the allegedly "unsupported assertions" (JA 303) were directly supported by the evidence in the record.  For example, "[M.O.] forced JD to touch him inappropriately several additional times in the 2008-09 school year" (JA 530 (J.D. Dep.)) and "[M.O.] tried to climb into JD's bathroom stall."  JA 386 (statement of J.D. to Assistant Principal Womack).

The School Board's and Ms. Schwab's expert, Mary Jo McGrath, has published materials recommending many of these same procedures.  In a three-part series she published on investigating complaints of bullying in schools, she suggested:

- Complaints should be made in writing by the employee who observed the behavior or to whom the alleged victim and/or witnesses communicated about the incident and should include the following information:

  - When did the incident happen?
  - Where did it happen?
  - Who was involved?
  - Describe what happened in as specific, objective and concrete terms as possible.
  - How many times did it happen?
  - Who saw it happen?
  - What are you requesting happen?

- Children under age ten years should not be responsible for filling out their own complaint forms.
- Parents should be informed before a student is interviewed.
- Complainants should be given copies of the school's bullying and harassment policies.
- The complaint manager should take action on the complaint within 24 hours.
- Two investigators should be used for complaints of sexual harassment.
- The Complaint Manager should create a confidential file for the investigation.
- Interviews should be conducted in a private room.
- Review records to determine if the incident is evidence of a pattern of conduct.
- Review all applicable board policies and regulations, as well as the Student Code of Conduct and Discipline Policy.

11

- o Talk to the students' teachers, bus drivers, or other employees with whom they come in contact.
- o Go to the location where the alleged bullying or harassment took place.
- o Do not limit the investigation to interviews of the Complainant and alleged perpetrator.
- o Always look beyond what appears to be an isolated incident or situation.
- o Look beyond the facts as presented by the complainant and alleged perpetrator, even if they are undisputed.

JA 263-68.

Besides failing in virtually all respects to conform to the standard of care for responding to allegations of sexual harassment as described by both experts, Appellees completely disregarded the Board of Education's sexual harassment policies. The Board's corporate designees testified unequivocally that the Board has one policy to address sexual harassment: Administrative Procedure 4170, which deals with "Discrimination and Harassment" and provides forms and procedures that instruct school personnel on how to handle complaints of sexual harassment. JA 219-36.

RGMS school personnel never used Administrative Procedure 4170 in response to J.D.'s or any other student's allegations of sexual harassment. Ms. Jellison had never seen the forms attached to Administrative Procedure 4170 prior to her deposition. JA 580-81. Ms. Schwab claimed not to know that the forms existed. JA 663-65. Ms. Schwab claimed to be unaware of her obligation to report

claims of sexual harassment to the Regional Assistant Superintendent or anyone else outside the school during the 2008-09 and 2009-10 school years. JA 682.

For the two-year period in which J.D. was a student at RGMS, no 4170 forms were forwarded by RGMS to the Equity Assurance Office, a fact that the Director of that office at the time found surprising. JA 558-59. Many other schools forwarded complaints of behavior similar to what occurred in this case to the Equity Assurance Office. Examples of those complaints and the investigations that occurred in response to those complaints are included at JA 387-420.

Ms. Schwab was the sole person responsible for reporting sexual harassment complaints to the Equity Assurance Office after she became acting principal part-way through the 2008-09 school year, yet the only training she had received in how to handle sexual harassment complaints was receipt of the administrative bulletin outlining the district's policy. JA 644. Even with that training, she confused the Board's Bullying, Harassment, and Intimidation policy, which was not applicable to sexual harassment complaints, with the Discrimination and Harassment Policy, Administrative Procedure 4170. JA 560-62, 666-67.

Proper use of the forms attached to Administrative Procedure 4170 would have produced a complete and thorough investigation of M.O.'s behavior toward J.D. One form walks school personnel through an appropriate investigation, and one directs administrators to document the steps they took in response to the

student/student harassment complaint.  JA 234-36.  Appellees' failure to follow these steps is evidence of their negligent or willful indifference to sexual harassment complaints.

In addition, the only training that teachers or staff received in how to handle sexual harassment complaints was an annual training that lasted one or two hours and covered a number of topics, including child abuse and neglect, homelessness, and bullying.  JA 564-66.  Half an hour of that training was used to show a video called "Straight Talk About Sexual Harassment," which mostly addressed employee-on-employee sexual harassment claims, not peer-on-peer sexual harassment.  JA 269.

As a result of their lack of training or indifference, the teachers, administrators, and staff at RGMS turned a blind eye to complaints of sexual harassment claims.  For example, although Ms. Jellison testified that she witnessed examples of sex-based name calling and other actions that would qualify as sexual harassment under the Code of Student Conduct,[5] she was reluctant to identify any of that behavior as "sexual harassment."  JA 567-68.

---

[5] The definition of "sexual harassment" in the Code of Student Conduct is "Behavior which includes, but is not limited to, verbal or physical sexual advances, including pressure for sexual activity; unwelcomed sexually motivated touching, pinching, patting or intentional brushing against; repeated sexual verbal harassment or abuse; repeated remarks of gestures of a sexual nature; obscene or profane language or humor; sexually oriented printed material; or demanding sexual involvement accompanied by threats."  JA 260.

Likewise Ms. Schwab would not agree that any single allegation of inappropriate sexual behavior, even one student touching another's genitals, was "sexual harassment." JA 655-57. According to Ms. Schwab, sexual harassment must involve a series of behaviors, and it was not the practice at RGMS to document individual allegations of behavior that together could be sexual harassment, even though the district policies required it. JA 658-61.

Because RGMS did not follow the Board's policies concerning complaints of sexual harassment, RGMS personnel never formally investigated J.D.'s allegations that M.O. had sexually harassed him, even though the complaints were repeated, frequent, and escalating in seriousness.

Ms. Schwab did not know any of the proper steps for investigating an allegation of sexual harassment. Indeed, she testified that the purpose of an investigation was not to determine whether or not the student had given a complete recounting of the conduct or whether the report was true, but to see if the victim is demonstrating "acting out behavior that really stems from insecurity and inability to do the [school] work." JA 668-69. The only written records the Board of Education produced of any supposed "investigations" that were conducted at RGMS of any allegations of sexual harassment by any RGMS student were brief student statements taken by the school security officer, Mr. Pfeil, after which no follow-up questions were asked. JA 689-90. Ms. Jellison testified that the only

"investigations" she did of sexual harassment claims at RGMS were to "talk to the Principal about some incidents" and "talk[] to the children involved" when M.O. humped J.D. in her classroom.  JA 569.  School officials did not interview witnesses, review policies, contact the students' parents, or perform any other of the steps outlined by Dr. Strauss and Ms. McGrath.

Mr. Pfeil testified that although he was often responsible for taking student statements related to alleged violations of the Code of Student Conduct, (JA 615-19), he was not the person responsible for determining the credibility of the witnesses or deciding how to address the situation from a disciplinary perspective.  JA 618-19.  Mr. Pfeil also testified that often he did not ask follow-up questions regarding the students' brief narrative statements.  JA 623-24.

Ms. Schwab and Ms. Jellison gave conflicting testimony, demonstrating that there was no clear protocol for investigating claims of sexual harassment at RGMS.  For example, Ms. Schwab testified that she was not involved with investigating the classroom library incident, that Ms. Johnson was responsible, and that she therefore had no knowledge of whether M.O.'s parents were ever called or notified.  JA 638-39.  Ms. Jellison, however, testified that she "[knew] Ms. Schwab was talking to both boys about [the incident]."  JA 582.

When M.O. began calling J.D. names and making inappropriate sexual comments to him in the Fall of 2008, Ms. Schwab knew what M.O. was doing, but

16

took no action.  JA 499-501, 645-46.  She did not follow up with J.D. or interview

M.O. to discuss the inappropriateness of this behavior or to determine what M.O.

had said to J.D.  Ms. Jellison also did not take any action to stop the name-calling.

When J.D. reported that the harassment had escalated to include M.O.'s

exposure of his genitals to J.D., school officials did not interview the children, did

not document the event, and did not take any disciplinary action toward M.O.  No

school official ever talked to J.D. or M.O. to learn the details of the incident.

Although Ms. Schwab directed Ms. Jellison to rearrange the classroom library, (JA

584-85), they both knew that this change would not prevent contact between J.D.

and M.O., as RGMS is a Montessori school in which students are permitted to

move freely around the classroom during much of the instructional time.  JA 605-

06.

Moreover, school officials failed to discipline M.O. or take effective action

to keep him away from J.D. even though Ms. Jellison knew at the time of this

incident, and even before, that M.O.'s contact with J.D. was inappropriate and

should be limited.  She testified:

> I knew there were problems with [M.O.] and [J.D.], and I knew that
> they shouldn't be together. They should be separated.  And I, I
> probably thought okay, well, I – this is nothing new to me to hear that
> there's problems with them and they should stay apart.

JA 585-86.

17

Although school officials administered their only discipline against M.O,
after he was caught "humping" J.D. during a classroom activity, they minimized
the humping as an "isolated incident."  They placed no documentation in M.O.'s
file to indicate that it had been part of a series of harassing behaviors aimed at J.D.
No one interviewed J.D. or M.O. to determine what, if any, other harassing
behavior had occurred since the classroom library incident two months before.
Nor did any RGMS officials follow up with J.D. in the weeks and months
following this incident to determine if the harassment had stopped.

The intervention was ineffective – the harassment continued into the next
school year, when J.D. again contacted Ms. Schwab to tell her that M.O. had made
comments to him in the bathroom that made J.D. "uncomfortable."  JA 676-78.
Despite the history of sexual harassment and bullying from M.O. directed at J.D.,
and even though J.D. said the comments made him uncomfortable, Ms. Schwab
did not properly investigate this incident.  She did not interview the children
separately, but instead brought them together to discuss the incident.  She asked
J.D., in front of M.O., to tell her what happened.  JA 673-75. Unsurprisingly, J.D.
was not comfortable confronting his harasser directly in front of a school
administrator.

Although J.D.'s complaints persisted through his fifth-grade year, to the
point where Ms. Jellison noticed that J.D.'s parents were at school complaining

with increasing frequency (JA 608-09), school officials virtually ignored J.D. when he reported, in January 2010, that M.O. had tried to climb into his bathroom stall with his pants down.[6]  Even though J.D. had complained many times about M.O.'s harassment, school officials conducted no meaningful investigation of this allegation.  There is no evidence that school officials made any attempt to discern in which bathroom this occurred, or at what time.  Deatrice Womack, the assistant principal in 2009-10, took J.D.'s one sentence statement after this incident, but did not ask a single follow-up question.  JA 700-01.  She referred the incident to Ms. Schwab.  *Id.*  Yet, Ms. Schwab admitted that she did not interview the students or conduct any investigation because she thought Ms. Womack was responsible for investigating the claim.  JA 694.

As a result of their failure to investigate, school officials dismissed the seriousness of the allegations and implemented an ineffective sign-in/sign-out policy for the bathroom rather than taking steps to ensure that J.D. and M.O. were kept apart.  In concept, students would have to sign out of class to use the bathroom so that only one student would be permitted to use the bathroom at a time, but school officials did not enforce the policy.  Within a week, students in Ms. Jellison's class stopped using the logs consistently.  JA 547-48.  Ms. Jellison

---

[6] The district court improperly refused to credit J.D.'s reports of this incident even though J.D. confirmed at his deposition that it happened.  *See* Ex. C, J.D. Dep. 21-22.

testified that because she did not like students to interrupt her during a lesson, children "go right past the sign-out book" on their way to the bathroom.  JA 594-95.

In addition, the school assigned J.D. an escort to the bathroom.  He declined this solution because he found having a bathroom escort "agonizing" and told his father that "kids made horrible jokes" about him.  JA 549-50.  Although J.D. was permitted to use a bathroom in the nurse's office, that office was in a separate building from Ms. Jellison's classroom.  To use it, J.D. would have had to walk outside and to another building in the middle of class, or leave the rest of his classmates when they were permitted to use the bathroom as a group on their way to music, lunch, or gym.  Ex. A ¶¶ 5-7.

School officials did nothing to suggest to M.O. that the ongoing behavior J.D. reported was unacceptable.  There is no evidence that anyone at the school talked to M.O. or his parents about the seriousness of the allegations, beyond eliciting a denial from M.O.  They did not require M.O. to have a bathroom escort, even though there was no question that M.O. had been the aggressor in all of the interactions between him and J.D. over the previous year and a half.

### III. The RGMS teacher communications logs demonstrate the school's lax attitude toward sexual harassment complaints.

The district court relied heavily on the "communications logs" Ms. Schwab and Ms. Jellison kept during the 2008-09 and 2009-10 school years, as well as a log that Ms. Schwab compiled after the fact in the summer of 2010, in erroneously concluding that there were only a few instances of sexual harassment incidents reported to Appellees, even though Appellants presented Ms. Jellison's testimony that she knew M.O.'s harassment of J.D. was "very serious," and presented evidence of the very incidents described above. These logs present a narrow, incomplete, and unreliable view of the harassment J.D. suffered from M.O. in the two years he was a student at RGMS. They have incorrect dates, they are missing events that all parties agree occurred, and the contemporaneous logs are missing large blocks of relevant time. Examples of the inaccuracies in the logs include:

- Ms. Schwab testified that the first complaint J.D. made was that someone had said something "of a sexual nature" to him in the bathroom. Ms. Schwab acknowledged that this is not documented in any of the communications logs. JA 645-47.
- Ms. Jellison remembers students calling J.D. "gay." JA 600. Those incidents are not documented in her log. JA 374-82.
- In Ms. Schwab's 2010 after-the-fact log, the incident that occurred in the classroom library is listed as occurring in March 2009, but Ms. Schwab testified it actually occurred in December 2008. JA 639-40.
- Ms. Schwab testified that the "water fountain incident" is listed in her log as occurring in the wrong school year. JA 671-73.
- Ms. Jellison testified that she talked to M.O.'s mother "quite often." Although she testified that she believed her logs were

21

comprehensive, only a handful of those conversations are documented in the communications logs. JA 571-73.

- Ms. Jellison also remembers Mr. Doe coming to her classroom several times to discuss J.D.'s problems with M.O. JA 597-98. None of these interactions are documented in her log. JA 374-82.

- Ms. Jellison admitted that the first three months of the 2008-09 school year are missing from her communications log (JA 374-82, 572-73), and that she was not sure if she even kept a communications log for the first six months of the 2009-10 school year. JA 374-82, 574-76. No log was produced for this six-month period.

- Ms. Jellison testified that she had a conversation with Jane Doe about keeping J.D. and M.O. separate on a school overnight trip, which Ms. Jellison said she believed occurred "because of some of the things that had gone on." JA 596. That communication is not documented in her log. JA 374-82.

Furthermore, there are no logs documenting communications the Does had with Principal Johnson, whom all parties agree was involved in handling the complaints the Does made in 2008-09. There are also inconsistencies between the testimony regarding who was responsible for handling which allegations. For example, according to Ms. Schwab, Ms. Johnson had asked Ms. Schwab to refer all complaints from J.D. or his parents to Ms. Johnson; as a result, Ms. Schwab's knowledge of the classroom library incident is incomplete. JA 633-35. Ms. Schwab testified that Ms. Johnson and Ms. Jellison handled that incident. JA 635. However, Ms. Jellison testified that she referred the incident to Ms. Schwab. JA 601-03. These omissions and contradictions show that rather than being a comprehensive record of all communications between the school, J.D., and Mr.

22

and Ms. Doe, these logs evidence the lax attitude RGMS took toward documenting and investigating allegations of sexual harassment.

The logs also reflect school officials' unwillingness to use sexual descriptions to describe behavior that was sexual in nature. For example, in Ms. Schwab's contemporaneous log, the classroom library incident is referred to as "[M.O.] intimidation threat in classroom library sometime in December '08; destruction of school property; obscenities," (JA 370), yet Ms. Schwab testified that this was the incident in which M.O. unzipped his pants and showed J.D. his penis. JA 631-33. Likewise, she described the incident in which J.D. reported that M.O. had tried to climb into J.D.'s bathroom stall with his pants down as J.D. "reported being intimidated in bathroom." JA 385.

**IV.** **Because of the sexual harassment J.D. experienced at M.O.'s hands while he was a student at RGMS, J.D. suffered both immediate harm that disrupted his ability to access an education at RGMS and lasting psychological harm that continues to affect his functioning today.**

The psychiatrist who treated J.D. in the months after the full extent of the abuse was discovered diagnosed him with Post-traumatic Stress Disorder (PTSD) and an Adjustment Disorder with Mixed Anxiety and Depressed Mood as a result of the abuse. JA 486. Both J.D.'s current therapist and Appellees' independent medical examiner confirmed that J.D. suffers from an Adjustment Disorder and exhibits symptoms of PTSD. JA 479, 492.

While he was a student at RGMS, J.D. had nightmares and difficulty sleeping because of the harassment.  JA 373, 527-30.  During his fifth-grade year, he began asking his mother to leave his light on in his room while he slept, and he had nightmares about M.O., including nightmares in which M.O. murdered J.D.'s parents and siblings and one in which M.O. squeezed J.D.'s genitals until he passed out.  JA 527-30.

In addition, Ms. Doe observed significant changes in J.D.'s behavior when he was in fifth grade.  She observed that he would cry and refuse to go to school, claiming that he had stomachaches.  JA 373, 473.

J.D. had suffered from encopresis, or fecal staining, as a young child, but by the time he entered fourth grade at RGMS the problem had abated for more than two years.  In the Spring of 2010, Ms. Doe noticed that the encopresis had returned and asked J.D. about it.  JA 373.  J.D. told her that he was holding his stool because he did not want to use the school bathrooms, and as a result, he was soiling his underwear.  *Id.*  Around the same time, J.D. also began expressing fear for his safety at school.  He asked his parents if his cousins could come to school to protect him.  JA 555-56.

Today, J.D. continues to suffer the effects of the abuse, particularly in his social relationships at his new school.  As his current therapist testified:

> Q. What behavior does J.D. exhibit that led you to the opinion that he
> suffers from PTSD?

24

A.  I think the main thing is the detachment of emotion that he seems to carry with him for such a young child and, also, a lack of attachment to his peers and his trust of his peers . . . . An average 13-year-old has people they call, they text, they go here and go there, do this and that and he's very involved in sports and on teams and very active but, if you ask him about friends, he doesn't have anybody that he identifies as friends, maybe he talks to them at school, but he doesn't identify friends.

JA 494-95.

Even Appellees' expert concluded that "it does appear that he was unhappy during part of the two school years at Goddard as a result of something that was going on there."  JA 478.  Because of the harassment J.D. suffered and Appellees' failure to protect him from further harassment, J.D. had no option but to withdraw from RGMS and attend a different school.  JA 373.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's grant of summary judgment because the information Appellees undisputedly knew about M.O.'s harassment of J.D. triggered their duty to take affirmative steps to separate J.D. and M.O. and thereby protect J.D. from M.O.'s harassment.  It does not matter that school officials did not know J.D. was being raped – they knew about sexual name calling, unwanted touching, M.O.'s exposure of his genitals, and other sexual conduct that made J.D. "uncomfortable."  What they knew was enough to constitute sexual harassment.  School officials were aware of this pattern of conduct and did not take reasonable measures to separate the children or to

investigate J.D.'s and his parents' complaints. That failure was a breach of their duty under both negligence law and Title IX, and it caused J.D.'s injuries.

The district court erred in two fundamental ways: First, the district court failed to consider the evidence in the light most favorable to the Does. The court 1) made improper credibility determinations, 2) cherry picked evidence by ignoring J.D.'s and his parents' statements, Appellants' proffered expert testimony, and school officials' admissions that they knew about M.O.'s pattern of harassing J.D., and 3) overlooked discrepancies in Appellees' witnesses' testimony. Any credibility determinations should have been reserved for a jury. Only by disregarding Appellants' proffered evidence could the district court reach its conclusions that the Does could not prove that Appellees breached their negligence duty, that their breach did not cause J.D.'s damages, that J.D. was contributorily negligent and assumed the risk, and that Appellees did not act with deliberate indifference.

Second, the district court analyzed Appellants' negligence claim under the same standard by which it considered whether Appellees acted with deliberated indifference under Title IX. Negligence does not require proof of deliberate indifference, but merely that school officials breached their duty to protect J.D. from known or perceived harm. The district court erred by applying the heightened standard to Appellants' negligence claim.

## STANDARD OF REVIEW

This Court must review the grant of summary judgment *de novo*. *See*

*Jackson v. Kimel,* 992 F.2d 1318, 1322 (4th Cir.1993). Appellees are entitled to

judgment as a matter of law only if there is no genuine dispute as to a material fact.

*See Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274 (4th Cir. 1995) (citing Fed. R.

Civ. P. 56(c)).

## ARGUMENT

**I.     The Board of Education and Ms. Schwab negligently failed to protect J.D. from sexual harassment.**

To state a claim for negligence, a plaintiff must plead and prove facts

showing "a duty owed to him . . . a breach of that duty, a legally cognizable causal

relationship between the breach of duty and the harm suffered, and damages.*"*

*Jacques v. First Nat'l Bank*, 307 Md. 527, 531 (1986). As the district court

recognized, Appellees owed J.D. a duty because a school serves "*in loco parentis*,

with the result that a school is under a special duty to exercise reasonable care to

protect a pupil from harm." *Lunsford v. Bd. of Educ.*, 280 Md. 665, 676-77 (1977).

Here, Appellees breached their duty to J.D. by failing to take reasonable steps to

investigate and stop M.O.'s harassment when they were the only people with the

ability to do so. Through this failure to act, they allowed J.D. to be subject to

escalating sexual harassment that culminated in rape and caused J.D. extreme

anguish and psychological injury.

**A.    The Board of Education and Ms. Schwab breached their special duty under *Lunsford v. Board of Education* to protect J.D. from M.O. by failing to prevent M.O.'s escalating harassment of J.D.**

"A duty is breached when a person or entity fails to conform to an appropriate standard of care and, in doing so, fails to protect third persons against unreasonable risks." *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 501 (2011) (citing *B.N. v. K.K.,* 312 Md. 135, 141 (1988)).  The district court erred in holding, as a matter of law, that "no reasonable juror could conclude that [Appellees] failed to exercise ordinary care to protect JD from [M.O.]'s harassment."  JA 300.  Under Maryland law, "reasonable care" requires a school to take steps to protect a student from known or suspected risk, even if the student denies that risk.  *See Eisel v. Bd. of Educ. of Montgomery Cnty.*, 324 Md. 376, 377 (1991) (school board breached its *Lunsford* duty by failing to inform parents of student's alleged suicidal statements even when she denied making them).  Failure to follow school procedures related to protecting students from specific harm is evidence of the school's breach of its duty under *Lunsford*.  *Id.* at 387-89.

In the present case, Appellees admitted that the Does have presented evidence that they repeatedly reported that M.O. committed "incidents of bullying and intimidation with sexual overtones."  JA 714.  Appellees breached the special duty they had to protect J.D. by failing to take reasonable steps to keep M.O. away from J.D. when they had received many complaints from J.D. and his parents about

M.O.'s bullying and sexual harassment.  In the district court, Appellees argued that only the most serious sexual assaults J.D. experienced constituted sexual harassment and that Appellees cannot be held accountable because they had no actual knowledge of the rapes.  JA 714-15.  However, the conduct about which they knew was sufficiently serious on its own to warrant intervention under *Lunsford*.

Appellees also breached their duty by failing to follow their own sexual harassment complaint procedures, by treating each complaint as an isolated incident rather than as an element of an escalating pattern, and by therefore failing to intervene to protect J.D.  Under *Eisel*, Appellees were required to conduct a reasonable investigation into the Does' complaints.  A jury could find that a proper investigation of the known harassment would likely have uncovered the repeated sexual assaults, which Appellees then would have taken further steps to prevent.

In assessing Appellees' actions, the district court only considered five instances of sexual harassment.  JA 280-82.  The district court ignored the multitude of other complaints about bullying and name calling that all parties agree occurred. *See* pages 4-8, *supra*.  On a motion for summary judgment, the court must view the facts and draw any inferences in in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587–88 (1986).  By failing to consider those other incidents, the court

disregarded this well-established standard.

Moreover, of the five incidents the court did consider, the court dismissed

out of hand two instances of sexually abusive comments that all parties agree were

reported, stating that they "involved vague remarks that [Appellants] have not

adequately linked to [M.O.]."  JA 301.  The record reflects, however, that Ms.

Schwab and Ms. Jellison both admitted that these instances of oral harassment

occurred, that they involved M.O., and that J.D. reported them, *see* pages 5-8,

*supra*.  Appellees' failure to follow up on these complaints is evidence of

negligence.  In the context of ongoing harassment, the alleged vagueness of the

reports does not defeat their probative value.

In holding as a matter of law that school officials met their duty to protect

J.D., the district court relied on *Boyer v. State*, 323 Md. 558 (1991), for the

principle that "an official's conduct should be judged not by hindsight but should

be viewed in light of how a reasonably prudent official would respond with the

same difficult situation."  JA 301.  Here, even under that standard, Appellees

should have intervened based on what they knew at the time J.D. and his parents

made their complaints.

Moreover, even in snap-judgment situations, like the high-speed chase in

*Boyer*, "a violation of police department policies or guidelines" would be an

"aggravating circumstance." *Id.* It has long been the law in Maryland that failure to follow official policies is evidence of a breach of a duty. *See Mayor & City Council v. Hart*, 395 Md. 394, 416-17 (2006) (collecting cases). In this case, school officials had two years to respond to the series of on-going complaints, yet they ignored all of the district's policies related to sexual harassment. They had a duty to protect J.D. from M.O. and they breached that duty by failing to intervene in any meaningful way that was calculated to keep the children apart and end the harassment.

Appellees were the only people in a position to see the full extent of the pattern of abuse by M.O. toward J.D. over time and to intervene before it escalated to the severe sexual abuse that all parties now acknowledge occurred. Yet, Appellees took no disciplinary action, or even investigatory action related to all but three incidents. When they did take action, they did not follow any of the school board's protocols for addressing sexual harassment. For example, from the Fall of 2008, Appellees were on notice that inappropriate behavior, beginning with name-calling, was occurring in the school bathroom, yet they took no steps until mid-way through the next school year to determine when the children were in the bathroom together, to monitor the children in the bathroom or prevent them from entering the bathroom at the same time. Even then, the steps they took were not calculated to be effective. Had they performed appropriate investigations into the earlier

31

complaints that J.D. made and kept records of them, they would have noticed that J.D.'s complaints about M.O. were uniformly sexual, continuing, and escalating in seriousness.

The proffered testimony of both experts in this case demonstrates that school officials did not meet the standard of care they owed J.D.  As discussed above at pages 9-12, both experts outlined the steps included in effective sexual harassment investigations.  In addition, Dr. Strauss opined that the following steps should have been taken to address the harassment and prevent it from recurring or escalating:

- Considering the severity of the misconduct, immediately remove [M.O.] from the School pending an investigation;

- Develop a safety plan for J.D.;

- Monitor [M.O.'s] behavior;

- Reexamine the District's APs;

- Disseminate the District's Harassment, Bullying and COSC APs; this task functions as a "teachable moment" for all school employees by informing them of the District's APs, and faculty and administrator's roles and responsibilities in intervening and responding to sexual harassment;

- Offer counseling to JD and [M.O.];

- Train the school community including all faculty, staff, administrators, bus drivers, secretaries, volunteers, and student ;

- Inform parents of the incidents (Doty & Strauss, 1996).

JA 431-32.  Appellees did not take any of these steps.  Thus a reasonable jury could find that the school board and Ms. Schwab breached the standard of care that they owed J.D. to protect him from M.O.'s harassment.

It does not matter that school officials did not know the full extent of the harassment until the end of the second school year.  The conduct about which the school officials *were* aware was not acceptable.  A reasonable jury could find that school officials were required to intervene when one student called another student derogatory names on a regular basis, made comments that made the other student "uncomfortable," exposed his genitals to the other student, humped the other student, or climbed into the other student's bathroom stall with his pants down.  Appellees could reasonably be held liable for the harm that J.D. suffered from their failure to take reasonable steps, based on the numerous complaints they had received, to investigate complaints and to prevent the harassment from continuing.  Thus, summary judgment is inappropriate.

**B.    A reasonable jury could conclude that the Board of Education's and Ms. Schwab's failure to properly investigate and intervene to stop a known pattern of sexual harassment was both the cause-in-fact and the proximate cause of J.D.'s injuries.**

The facts before the Court demonstrate that Appellees' actions caused J.D.'s injuries.  "Causation-in-fact concerns the threshold inquiry of whether defendant's conduct actually produced an injury."  *Pittway Corp. v. Collins*, 409 Md. 218, 244 (2009).  Causation-in-fact can be proven by either showing that "the injury would

not have occurred absent or 'but for' the defendant's negligent act," or by showing

that it is "more likely than not that the defendant's conduct was a substantial factor

in producing the plaintiff's injuries." *Id.*[7]  In holding that Appellees did not cause

J.D.'s injuries, the district court incorporated the reasoning by which it concluded

that Appellees did not act with deliberate indifference as required under Title IX

into its analysis of Appellants' negligence claim.  JA 305.  That reasoning is

improper because deliberate indifference is a higher standard that requires that

Appellees acted with actual knowledge in a way that was "clearly unreasonable,"

as opposed to a negligence claim, which only requires evidence that Appellees

breached the standard of care that they owed J.D.  The record reflects that

Appellees' failure to intervene allowed M.O. continued opportunity to escalate his

harassment of J.D.

Here, J.D. and M.O. were elementary school students.  During the two years

at issue, Ms. Schwab was the assistant principal, then principal at RGMS.  Ms.

Jellison was the two boys' classroom teacher.  Both were responsible for the

discipline of the children in Ms. Jellison's class.  The record reflects that the few

disciplinary actions taken toward M.O. were taken by Ms. Schwab and Ms.

---

[7] The district court declined to decide whether the "but for" or the "substantial factor" test for cause-in-fact applied in this case, but under either test Appellees were responsible for student discipline and controlling the conduct of students at RGMS.  Even if there were other factors, which the district court did not identify, Appellees' failure to meet this duty resulted in J.D.'s injury.

Jellison.  The district court held that no reasonable juror could have found that Appellees' inaction caused J.D.'s harm, in essence, because M.O., a nine-year-old boy, was hell-bent on abusing J.D. and could not be stopped, and that J.D.'s injuries were therefore unpreventable.  JA 305-06.  This premise conflicts with common knowledge about the workings of an elementary school and the record in this case.

An elementary school is not a high school or a college.  Students are not given the freedom to wander the halls and move from class to class by themselves. They are under the supervision of teachers and administrators for virtually every minute of the day.  Their comings and goings are closely monitored, and teachers and administrators have the capacity to control these movements.  A reasonable jury could conclude that Appellees failed to control M.O.'s movements. Appellees have not met their burden on summary judgment to show that they could not control M.O.'s behavior.

In addition, Appellees were the proximate cause of J.D.'s injuries because those injuries were "within a general field of danger that [Appellees] should have anticipated or expected."  *Pittway Corp*, 409 Md. at 245.  As discussed at length elsewhere in this brief, Appellees were well aware that M.O. was sexually harassing J.D. and that the harassment had caused J.D. enough emotional distress to warrant regular complaints to school officials.  The test of foreseeability "is

simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where . . . it appears 'highly extraordinary' that the negligent conduct should have brought about the harm." *Henley v. Prince George's Cnty.*, 305 Md. 320, 334 (1986). Appellees need not have foreseen J.D.'s specific injuries; it is enough if they should have foreseen that the type of injury, psychological harm from sexual harassment and bullying, could occur from ignoring J.D.'s complaints about M.O. *See, e.g., Hammond v. Robins*, 60 Md. App. 430, 436 (1984); s*ee also Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 337 (1993) ("Our analysis of foreseeability in the proximate cause context turns on whether the actual harm to the appellant fell within a general field of danger that [defendant] should have anticipated, rather than whether the harm was the specific kind that he should have expected.").

The facts of this case are materially distinguishable from those in which the Maryland Court of Appeals has held that there was no proximate cause because harm was not foreseeable. *See, e.g., Hartford Ins. Co. v. Manor Inn of Bethesda*, 335 Md. 135 (1994) (hotel did not proximately cause injuries sustained by driver who was involved in accident with escaped mental patient who stole van that hotel employee had negligently left unattended with keys in ignition); *Stone*, 330 Md. 329 (attorney's negligent failure to record deed did not proximately cause financial

36

loss where a year later the plaintiff had an emergency need for cash, attempted to borrow against his home to satisfy that need, and unable to do so had to sell stock in a depressed market to raise it.); *Peterson v. Underwood*, 258 Md. 9 (1970) (no proximate cause where original house owner had negligently constructed wall in violation of city building code and wall collapsed four and a half years after its construction). In each of these cases, the harm was temporally distant from the negligent acts or the negligence was superseded by a third party's unforeseeable actions. With respect to time frame, J.D. and his parents continued to report complaints about M.O.'s harassment into his fifth grade year, when the rapes occurred. JA 368, 608, 676-78, 692-93. M.O.'s actions also were not an unforeseeable superseding cause – the ultimate harm here was a difference of degree, not of kind. Bullying and sexual harassment, including allegations of inappropriate touching, ultimately led to rape. This was horrible, but not unforeseeable.

The district court also seems to have reasoned that M.O.'s actions would absolve Appellees of liability by defeating causation because he was a third party. JA 306. But, M.O. was exactly the same person about whom J.D. had complained continuously for two years, not an unknown or unexpected third party. It was foreseeable to Appellees that M.O. would continue to harass J.D. if they did not take meaningful action to stop the harassment, including investigating the

complaints from J.D. and his parents.  Their failure to do so was therefore a

proximate cause of J.D.'s injuries.  To hold otherwise would render the duty

outlined by *Lunsford* meaningless:  school officials would always have a causation

defense to any claim that they breached their duty to protect students from third-

party harm.

> **C.    A reasonable jury could conclude that J.D. was not contributorily negligent and did not assume the risk of sexual abuse, by continuing to use the school bathroom after he had been sexually harassed there.**

"In assessing whether [a] child was guilty of contributory negligence, the

standard of conduct is that of ordinarily prudent children of the same age,

experience and intelligence."  *Brown v. Rogers*, 19 Md. App. 562, 566 (1974).

Maryland Courts have long held that contributory negligence is a question of fact

for the jury, and not appropriate for summary judgment.  *See, e.g., Int'l*

*Brotherhood of Teamsters v. Willis Corroon Corp.*, 369 Md. 724, 740 (2002);

*Moodie v. Santoni*, 292 Md. 582, 587 (1982); *Hill v. Wilson*, 134 Md. App. 472,

492 (2000) (quoting *Campbell v. Montgomery Cnty. Bd. of Educ.*, 73 Md. App. 54,

64 (1987)) ("Ordinarily, the question of whether a plaintiff was contributorily

negligent or assumed the risk is one for the fact finder, not the court.").  "In order

to establish contributory negligence as a matter of law, the evidence must show

some prominent and decisive act which directly contributed to the accident and

which was of such a character as to leave no room for difference of opinion

thereon by reasonable minds." *Baltimore Gas and Elec. v. Flippo*, 348 Md. 680, 703 (1998).

Here, J.D., a nine-year-old boy, testified that he did not want to use the school bathroom because he was scared of being in the bathroom at the same time as M.O.  J.D. also suffered from encopresis as a result of his unwillingness to use the school bathroom.  A reasonable juror could find that J.D. exercised the care reasonable of a nine-year-old elementary-school student by continuing to use the school bathroom from time to time instead of soiling his clothing or using the nurse's bathroom. The fact that there was a nurse's office and that J.D. was permitted to use the bathroom there is not enough to demonstrate that using only that bathroom was the only reasonable course of action for J.D.  School officials never raised this factual basis for contributory negligence and the Does therefore were never given the opportunity to submit evidence that requiring J.D. to use the nurse's bathroom all the time was unreasonable.  Rule 56(f) provides that a court may only grant a motion for summary judgment on grounds not raised by a party "[a]fter giving notice and a reasonable time to respond."  Fed. R. Civ. P. 56(f).

Here, Appellants did not have the chance to show that the nurse's office was in a different building from J.D.'s classroom and that using it would have disrupted his class schedule and further singled him out from his classmates.  Ex. A ¶ 8. Evidence elicited in this case shows that although J.D. was permitted to use the

bathroom in the nurse's office, the rest of the children in his class used the nearby bathroom between classes or at lunch. *Id.,* JA 695-97. The record reflects that J.D. already felt embarrassed by the appointment of a bathroom escort and that J.D. had been picked on and bullied by his classmates since he began attending RGMS. JA 549-50. A reasonable jury could conclude that, in these circumstances, nine-year-old J.D. was not contributorily negligent by occasionally using the regular bathroom.

The district court also held that J.D. assumed the risk of M.O.'s sexual abuse by using the regular bathroom instead of the nurse's bathroom. JA 307-08. To prove the assumption of risk defense, the defendant must show that the plaintiff: "(1) had knowledge of the risk of the danger; (2) appreciated the risk; and (3) voluntarily confronted the risk of danger." *Reid v. Wash. Overhead Door, Inc.*, 122 F.Supp.2d 590, 595 (D. Md. 2000) (citing *Liscombe v. Potomac Edison Co.,* 303 Md. 619 (1985)). Because Appellees also did not raise this defense, Appellants again were not given the opportunity to introduce evidence that J.D.'s use of the regular bathroom was not voluntary. As discussed above, using only the nurse's bathroom was an untenable option, and J.D.'s health depended on using the bathroom during the school day.

**II.    A reasonable jury could conclude that the Board of Education and Ms. Schwab discriminated against J.D. on the basis of sex in violation of Title IX.**

As the district court stated, "to establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) []he was a student at an educational institution receiving federal funds, (2) []he was subjected to harassment based on [his] sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).

The district court correctly held that J.D. has made out the first two prongs of this test.  The first is not in dispute.  As to the second, the harassment J.D. suffered, including M.O.'s humping movements, his exposure of his genitals to J.D., his sexual remarks and name calling, his entering of J.D.'s bathroom stall with his pants down, and his forcing J.D. to perform oral and anal sex with him are "proposals of sexual activity offensive touching of a sexual nature, and sexually charged comments," and therefore meet the second prong of a Title IX claim.  JA 287.

**A.**   **A reasonable jury could conclude that the harassment J.D. suffered was so severe and pervasive that he was denied equal access to the educational opportunities available at RGMS because of his psychological harm, his withdrawal from school, and his fear of using the school bathroom.**

The Supreme Court has held that in order to prove a claim under Title IX, "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 651 (1999). Although this standard includes both an assessment of the harasser's conduct and an assessment of the effect of the conduct on the victim, courts treat this as a single element of a Title IX claim. *See, e.*g.*, Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 966 (D. Kan. 2005). The evidence in this case demonstrates that the Does can prove both prongs of this element.

**i.**   **The harassment J.D. suffered was severe and pervasive within the meaning of Title IX.**

Other courts' decisions in Title IX peer sexual harassment cases demonstrate that the harassment J.D. suffered was so severe, pervasive, and offensive as to subject Appellees to liability. In *Davis*, the Supreme Court reversed the dismissal of a Title IX claim that involved conduct similar to what all parties agree occurred in this case. The plaintiff in *Davis* reported that "the classmate, G.F. attempted to

touch the plaintiff's breasts and genital area and made vulgar statements" and "rubb[ed] his body against the plaintiff." 526 U.S. at 634-35. Here, J.D. reported that M.O. made vulgar statements on several occasions, and that he rubbed his body against J.D. (the humping incident). Rather than reporting that M.O. attempted to touch J.D.'s genitals, as did the plaintiff in *Davis*, J.D. reported that M.O. exposed his genitals to J.D. in the classroom library and attempted to climb into J.D.'s bathroom stall with his pants down. The Supreme Court's recitation of the *Davis* facts that created a hostile environment includes seven instances of sexual harassment, all of which were very similar to the at-least-ten instances of sexual harassment in this case that were undisputedly reported. *See* 526 U.S. at 633-34.

Further, the harassment in this case escalated far beyond vulgar statements and unwanted touching to forced anal and oral sex, and the conduct lasted for two entire school years. Courts have found that conduct significantly less severe than that in this case supports a Title IX claim. *See, e.g., Bruning ex rel. Bruning v. Carroll Cnty. Sch. Dist.*, 486 F. Supp. 2d 892, 917 (N.D. Iowa 2007) ("conduct alleged was pervasive since it continued to occur with some frequency over a period of several months during two different grades" and "included sexually explicit and vulgar language and repeated acts of objectively offensive touching or sexual groping which plaintiffs assert was unwelcome and intimidating"). Indeed,

in at least two cases, the offensive conduct included teasing and name calling, but no physical contact at all, including no exposures of genitalia, as there were in this case. *See Theno*, 377 F. Supp. 2d at 954; *Snelling v. Fall Mountain Reg'l Sch. Dist.*, CIV. 99-448-JD, 2001 WL 276975 (D.N.H. Mar. 21, 2001).

The evidence in this case demonstrates that even Appellees considered M.O.'s conduct to be severe, pervasive, and objectively offensive. Ms. Jellison described M.O.'s verbal sexual harassment of J.D. as "severe name calling." JA 607. She testified that there were "so many" incidents that she had trouble remembering them all. JA 592-93, 608. She believed his bullying behavior toward J.D. was "very serious." JA 570-71. And she testified, unprompted, that she was very surprised that J.D. and M.O. were kept in the same class for J.D.'s fifth grade year. JA 586. Appellees clearly knew that M.O.'s behavior was ongoing, extremely problematic, and harmful to J.D.

### ii.    The harassment J.D. suffered effectively denied him equal access to educational opportunities.

The effect of the harassment on J.D. further supports his claim that the conduct deprived him of educational opportunities. A number of courts have held that psychological injury is a deprivation of educational opportunities. *See Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 256 (6th Cir. 2000) (depression); *Theno*, 377 F. Supp. 2d at 954 (plaintiff suffered from post-traumatic stress disorder, anxiety disorder, and avoidant personality disorder); *Bruning*, 486 F.

Supp. 2d at 917-18.  Psychological injury can suffice even where the plaintiff's grades[8] or attendance has not changed.  *See Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1084 (D. Minn. 2000); *Bruning*, 486 F. Supp. 2d at 917-18.  Several courts have also held a decision to withdraw from school to be the type of deprivation that is actionable under Title IX.  *See Vance*, 231 F.3d at 256 (6th Cir. 2000); *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 953 (S.D. Ind. 2007); *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 445 (D. Conn. 2006); *Theno*, 377 F. Supp. 2d at 954.

Here, J.D. suffers from PTSD and an Adjustment Disorder with Mixed Anxiety and Depressed Mood as a result of the abuse he experienced at RGMS. JA 485-86.  As discussed above at pages 23-25, both J.D.'s current therapist and Appellees' independent medical examiner confirmed these diagnoses.  JA 479, 492-93.  While J.D. was a student at RGMS, his parents noticed significant and disturbing changes in his behavior – he began needing to have his light left on at night in his bedroom, had nightmares related to the abuse, and refused to go to school.  JA 373, 473, 527-29.

In addition, J.D.'s encopresis returned because he did not want to use the school bathrooms, which were the site of the most severe abuse.  JA 373.  As J.D. testified:

---

[8] Because RGMS is a Montessori school, there are no grades at RGMS for which to evaluate a change for J.D.  JA 373.

> I was scared of going into the bathroom if -- because he may have he
> may go in there while I was in there, so I started not using the
> bathroom, and then I would get really bad stomach pains.

JA 523-24.  Physical exclusion from an area of the school is one way "by which a

plaintiff can demonstrate deprivation of an educational opportunity."  *See Hawkins*

*v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003).[9]  The facts in the

record are sufficient for a reasonably jury to conclude that J.D. was denied access

to part of the physical structure of RGMS because he was prevented from using the

bathroom.

---

[9] Although J.D. also testified that he believed that the bathrooms were not clean, he stated clearly that he was afraid to use them.  The district court improperly made a credibility determination, based on an incomplete record, that J.D. could not have actually been afraid, and therefore deprived of the right to use the school bathroom, because he continued to use it on some occasions during which the harassment continued.  JA 289 n.1.  Appellees did not dispute that the sex acts were occurring in the school bathroom or that J.D. generally refused to use them.

Regardless, it would be illogical for a ten-year-old student to choose soiling himself over using a bathroom that was not clean unless he had another reason for not using the school bathroom.  The district court also discounted the fact that J.D. may have used the bathroom less frequently, rather than not at all, because of his legitimate fear of encountering M.O.  Such a limitation would also be a deprivation of an educational opportunity.  J.D.'s motivation for not using the bathroom and any change in the frequency with which he used it is, at best, a question of fact for the jury.  *See, e.g., Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d at 445 (denying summary judgment where student testified that she changed schools both because of sexual harassment and for other reasons).

**B.    A reasonable jury could conclude that the Board of Education and Ms. Schwab acted with deliberate indifference to J.D.'s complaints by failing to properly investigate his claims and those of his parents, and therefore failing to take actions that were reasonably calculated to stop the harassment.**

The district court correctly noted that the Supreme Court held in *Davis* that a school is only liable for peer sexual harassment when school officials' "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648; JA 291. However, by accepting Appellees' argument that each instance of sexual harassment was an isolated incident rather than part of an escalating pattern, the district court erred in finding as a matter of law that Appellees' responses to known harassment were not "clearly unreasonable."

The U.S. Department of Education Office for Civil Rights "Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties" ("OCR Guidance") provides additional clarity on the standard for addressing student-on-student sexual harassment, stating that, "the school is responsible for taking <u>effective</u> corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively."[10] (emphasis added).  *Davis* and the OCR Guidance demonstrate that a response is "clearly

---

[10] Available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

unreasonable" when it is not calculated to be effective, or when repeated harassment demonstrates that it has not been effective. *See also, Vance*, 231 F.3d at 260-62 ("[W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior.").

As an initial matter, Appellees had actual knowledge about the persistent and pervasive sexual bullying J.D. suffered at M.O.'s hands. The district court's recitation of the facts in this case identifies only five examples of sexual harassment about which Appellees had notice, (JA 280-83), when Appellees have admitted that J.D. sought help and intervention for at least ten incidents of sexual harassment or related bullying. *See* pages 7-8, *supra*.

In response to the Does' reports, Appellees buried their heads in the sand, treating J.D.'s complaints about M.O. as isolated incidents and failing to acknowledge that they constituted an ongoing pattern of sexual harassment. The district court, too, viewed these incidents as separate and unrelated, when it should have viewed them, in the light most favorable to Appellants, as part of an ongoing pattern. The first six reported incidents are unambiguously sexual. As to the other four, Appellees' own witnesses admitted that Appellees never investigated enough to determine if they were sexual or non-sexual. Ms. Jellison admitted that she often ignored J.D.'s complaints, that J.D. often tried to tell her things at times she

considered inopportune, and that she did not listen to him in those instances. JA

583-84, 591. Implied notice is sufficient to prove actual knowledge "where the

party to be charged is shown to have had knowledge of such facts and

circumstances as would lead him, by the exercise of due diligence, to a knowledge

of the principal fact." *Baltimore v. Whittington*, 78 Md. 231 (1893).

Moreover, this Court has recognized that actions that "may seem harmless in

the abstract can have sexual connotations" when viewed in the context of an

ongoing pattern of sexual harassment. *See Okoli v. Baltimore*, 648 F.3d 216, 222

(2011). Had Ms. Jellison or Ms. Schwab exercised due diligence by asking follow-

up questions and conducting valid investigations of these additional incidents,

Appellees would have discovered the full extent of the pattern of sexual

harassment. Because they did not, they failed to take action that was reasonably

calculated to prevent further abuse.

As discussed above, Ms. Schwab continuously denied that any of J.D.'s

allegations of repeated conduct were allegations of sexual harassment or that

school officials had any responsibility to investigate them as allegations of sexual

harassment. *See* page 15, *supra*. In addition, Ms. Schwab went out of her way in

her communications logs to avoid describing anything as explicitly sexual. *See*

page 23, *supra*. By downplaying the sexual nature of these incidents, Appellees

failed to respond as they should have.

49

The opinions of courts that have applied the "clearly unreasonable" standard for deliberate indifference demonstrate that the types of actions Appellees allege they took in this case were clearly unreasonable, ineffective, and not calculated to stop M.O.'s harassment of J.D.  For example, continuing to "speak" to the offender about his actions when that intervention has proved ineffective can demonstrate deliberate indifference, *Vance*, 231 F.3d at 264, as can school officials' failure to investigate to "determine the exact nature" of sexual harassment is.  *See Bruning*, 486 F. Supp. 2d at 915.

Appellees' responses were not reasonably calculated to stop the harassment or to remedy the harm J.D. had suffered, and instead left him vulnerable to further abuse.  In response to all but the most serious complaints the Does made, Ms. Schwab and Ms. Jellison did nothing more than talk to the boys, and then not even separately.  JA 499-500; 645-46; 673-75.  After some complaints, no one even spoke to M.O. or J.D.  JA 370-71.

When school officials did take further steps, those steps were not reasonably calculated to stop the harassment.  As Ms. Jellison testified, the Montessori program at RGMS allowed students considerable freedom to move around the classroom, (JA 606), such that rearranging M.O. and J.D.'s seats after the classroom library incident was not a step that school officials could reasonably have believed would prevent future contact between the two students.  Ms.

Schwab, who has worked in Montessori schools since 1986, would have known this was not an effective solution.

Likewise, the few half-steps put in place after M.O. attempted to climb into J.D.'s bathroom stall with his pants down were also unreasonable. Students were permitted to disregard the sign-in/sign-out sheets shortly after they were implemented, (JA 547-48, 594-95), and even when they were in effect, those sheets were used only to monitor the students during their regular classroom time, not during lunch, recess, physical education, music, or art, or at the beginning or end of the day. JA 695-98. With respect to the bathroom escort, Ms. Jellison knew that other students viewed J.D. as a "snitch" and made fun of him for reporting other students' improper behavior to the teachers. JA 599. When J.D. indicated that he did not want an escort, because, as Mr. Doe testified, having a bathroom escort "was agonizing for [J.D.]" because "kids made horrible jokes" about him, the appropriate response was not to allow the protection to go by the wayside, but to put another system in place to protect J.D. JA 549-50. Appellees could have given M.O. an escort or placed the students in different classes so that they would not have the same bathroom schedule between classes.

Failure to utilize a district's sexual harassment policies is further evidence of deliberate indifference. *See Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 211-12 (D.N.H. 2009) ("While departures from the strictures of such a policy do

not necessarily indicate deliberate indifference, a wholesale failure to employ established procedures for investigating sexual harassment complaints is a different story."); *Bruning*, 486 F. Supp. 2d at 915-16; *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 708-09 (E.D. Pa. 2007); *Michelle M. v. Dunsmuir Joint Union Sch. Dist.*, 204CV2411MCEPAN, 2006 WL 2927485, at * 5-6 (E.D. Cal. Oct. 12, 2006).

Not only did school officials at RGMS, and Ms. Schwab in particular, fail to follow district policies regarding sexual harassment, but they claimed to be completely unaware of those policies or the steps involved in conducting a proper sexual harassment investigation.  JA 569, 580-81, 663-69, 689-90.  As discussed above at pages 9-12, both parties' experts outlined multi-step, detailed processes for investigations, none of which were utilized in this case.  Those responsible for interviewing students and taking statements did not ask any follow-up questions, (JA 616-19), document their "investigations" (JA 429-31), confer with the parents of the children involved, or interview the students involved in private.  They failed to do this even when they were dealing with very young children, and even after the incident in which M.O. tried to climb into J.D.'s bathroom stall with his pants down, which was by then part of a long string of reported sexually harassing behaviors.  The "investigations" that were allegedly conducted in this case

therefore were not reasonably calculated to determine what happened between J.D. and M.O.  As the Does' expert explained:

> Other than the few scant notations . . . in the Teacher Communication Log, the District has provided no evidence that a formal investigation of JD's or his parents' complaints were ever conducted. The District's failure to conduct its own investigation prevented it from reliably assessing the misconduct and its likelihood of recurring in violation of Title IX, OCR regulations, the District's own Harassment, Bullying, and COSC APs, as well as recognized standard practices for determining if any misconduct occurred.

JA 429.

Ms. Schwab's refusal to recognize any behavior as an act of sexual harassment demonstrates that she also did not follow the Code of Student Conduct. The Code of Student Conduct makes clear that sexual harassment is a "Level II" offense.  JA 247.  There are a number of disciplinary actions that are listed as appropriate responses to Level II offenses, including:

- Parental contact by phone and written or oral notification to parent or guardian
- Behavioral probation
- Administrator/teacher/student conference
- Detention and/or Detention Hall
- Parent shadowing
- Exclusion from extracurricular activities
- Mediation
- Behavior contract
- Temporary removal of the student from classroom
- In-school suspension
- Suspension of transportation privileges

*Id.*  The policy states that "serious or repeated Level II misbehavior may result in a more serious consequence or treated as a Level III or IV offense," for which the penalties are suspension or expulsion.  *Id.*  However, because RGMS staff refused to acknowledge that any of M.O.'s behaviors constituted "sexual harassment," they did not utilize the disciplinary measures that were available to them to prevent M.O.'s further harassment of J.D.  Had Appellees treated the abuse as sexual harassment and taken any of the steps outlined in the Code of Student Conduct, they would have been able to intervene in a way that would have actually protected J.D. from M.O.

The record also establishes that Ms. Schwab refused to consider name calling or any sort of verbal harassment serious enough to be treated as an allegation of sexual harassment.  Thus, when in the beginning of J.D.'s second year, he told Ms. Schwab that M.O. said something that made him "uncomfortable," she brought the two students together to discuss the incident.  JA 674-75.  She asked J.D. to repeat what specifically M.O. said in front of him, and when he refused, she took no further action, despite the history of harassment.  Further, she claimed she told M.O. that any further action would be grounds for suspension, *Id.*, but then never followed through with that suspension after the

bathroom incident. Indeed, the only disciplinary action taken against M.O. at all was the suspension he received after the humping incident.[11]

The district court considered only the actions Appellees claimed they took in response to the few instances that they chose to document in their incomplete communications logs in considering whether they acted with deliberate indifference. The court ignored the other instances of harassment that Ms. Schwab and Ms. Jellison admit occurred and that the Does alleged and supported in their opposition to Appellees' motion for summary judgment. Appellees took no action in response to those incidents and their failure to respond is evidence of deliberate indifference.

## **CONCLUSION**

Under state tort law and Title IX, Appellees had a duty to protect J.D. from harm they knew of or should have anticipated. The record reflects that there was a pattern of ongoing sexual harassment by M.O. toward J.D., that J.D. and his

---

[11] Although M.O. was supposedly put on "behavioral probation" after the classroom library incident, Ms. Jellison did not know what this term meant, JA 587-88, and Ms. Schwab would not outline the formal processes related to it, or how it was implemented. JA 641-42. Although there is a definition of "behavioral probation" in the Code of Student Conduct, the process described requires "formal notice to the student and parent(s)/guardian(s) and an opportunity for a parent(s)/guardian(s) conference. Behavioral probation should be for a definite period during which critical examination and evaluation of the student's progress is to take place," among other formal requirements. JA 249-50. There is no documentation in M.O.'s file of any of these formalities or even any contact with his parents related to this incident. Thus, a jury could reasonably conclude that M.O. was not actually placed on behavioral probation.

parents made school officials aware of that pattern, and that school officials did not take the reasonable steps necessary to investigate and stop the harassment. As a result, the harassment escalated to severe sexual abuse. For the foregoing reasons, Appellants can be held liable for their failure to act, and the Court should reverse the judgment of the district court and remand the case for further proceedings.

Respectfully submitted,

Dated: March 18, 2014

/s/ _____
Sharon Krevor-Weisbaum
Andrew D. Freeman
Laura Ginsberg Abelson
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street
Suite 1700
Baltimore, MD 21202
Tel: (410) 962-1030
skw@browngold.com
adf@browngold.com
labelson@browngold.com

***Attorneys for Appellants***

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND
## TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(A) because this brief contains 13,432 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in a 14-point Times New Roman font.

                              Respectfully submitted,


Date:  March 18, 2014          By:   /s/ 
                                    Laura Ginsberg Abelson
                                    *Counsel for Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all counsel.

By:  /s/ _____
           Laura Ginsberg Abelson
           *Counsel for Appellants*